IN THE U.S. DISTRICT COURT FOR EASTERN NEW YORK

UNITED  STATES  OF  AMERICA  /

       Plaintiff  /

       Vs.  /

BRUCE  ANTHONY  GORCYCA  DIMARCO  /

       Defendant  /

/
/
/
_____  /

**RECEIVED**
JUL 17 2007
Case No:
**PRO SE OFFICE**

**CV 07   3066**

AMON, J.
REYES, M.J

LIBERTY  ISSUE

EMERGENCY  WRIT  OF  HABEAS  CORPUS

Comes now the movant, pro-se, en forma pauperis before this most
honourable court in accordance with Federal Rule/Statute 2241 and
Rule 48(B) to respectfully request habeas remedy and relief for
violation of due process rights, unneccessary delay, and abuse of
process in violation of Constitutional rights.  The movant is not
a lwyer (jailhouse or otherwise) but is a university graduate
making his best effort to obtain genuine justice.  This motion is
not frivolous.  Movant requests hearing on this matter at the the
Court's earliest possible convenience and since he is currently
incarcerated at the Brooklyn Detention Center under inmate number
22169-004 in Brooklyn, New York, he also respectfully requests
that this honorable court issue the appropriate transportation
order to the U.S. Bureau of Prisons to transport the movant to
your courthouse for said hearing.

REMEDY  REQUESTED:  The movant seeks only those remedies deemed
to be just and appropriate by this court but respectfully requests

that this honoroable Court consider the following resolutions;

A) Dismissal with prejudice of this case and all related charges, or

LANCE CROPPOOT-SWEDE, RON FISCHETTI, JOEL WEISS

B) Appointment of Attorney Alan Futerfas, for the defendant, or

C) Interim release on bail bond of $50,000 security with whatever reasonable conditions the court deems appropriate, or

D) Abuse of process evidentiary hearing with Atty. Futerfas present with defendant and pertinent witnesses.


BACKGROUND:  The movant is a 53 year-old American citizen, married to a Canadian citizen with two young children, ages 7 and 11, the youngest of which suffers from separation anxiety.  The movant is also an honorably-discharged military veteran and current Chairman of the volunteer organization Veteran Organ Donors International (see www.VeteranOrgan Donors.org).  He is diagnosed with both angina and claustrophobia since 2001 and 1977 respectively, and medicated 24/7 while jailed to cope with the claustrophobia with sedatives that are potentially addictive. He previously worked for a Fortune 500 company & the U.S. federal govt. The movant SURRENDERED  HIMSELF  INTO CUSTODY of Canadian officials in February 7th, 2007 following a seven year extradition battle that was for one count of attempted wire fraud which grew into six counts after the movant refused to forfeit his right to an extradition hearing in Canada. The movant IS NOT INDICTED and the extradition was based on a complaint which apparently grew out of an SEC matter in Florida in the summer of 1999 while the movant was residing in Ohio. *Since the movant was never served, contacted, nor interviewed by the SEC at, or for any hearing, he is unsure of the actual details of development.  However, an FBI official contacted the former wife of the movant and in her presence told the movant by telephone "You can either be a witness or a defendant" (SEE ATTACHED  EXHIBIT  A).  Shortly thereafter, the movant and his then-pregnant wife began receiving telephonic death threats both in Miami and Ohio.  At about the same time (April 12-15, 1999) the movant and his wife received an early morning call from the ICU duty

doctor at Parma Community Hospital in Ohio that his mother (Martha Gorcyca) was hospitalized, on life support, and might not suvive. Being and only child with a deceased father, the movant flew immediately to attend to his mother in Ohio and remained there continuosly through late December of 1999 as confirmed by multiple witnesses and family members.  Martha Gorcyca expired on June 16th, 1999 and was buried two weeks later. (SEE  EXHIBITS F, X,Y,Z). According to the 1999 complaint against the movant, he was allegedly sending faxes in Florida during the first two weeks of June, 1999 when in fact he was almost living 12 hours per day in his mother's hospital room in Ohio. (SEE EXHIBITS D, H, & B). ALSO SEE EXHIBITS W, X, Y, AND Z.

After burying his mother, the telephonic threats continued to both the movant and his wife and they sought the help of the FBI who claimed they could do nothing since the voice of the caller was not recognized and caller ID was not installed on the mother's home phone. At the same time the movant's in-laws were in Ohio visiting since the funeral and the elderly mother-in-law (Chai Jin Yum) began complaining of severe migraine headaches growing worse by the day. Because of the mysterious death threats (since confirmed by the FBI & RCMP) and concern/worry for the health of the mother-in-law, the family agreed to move back home to Canada with the movant to get an MRI and CAT scan for Chai Jin just as soon as the baby was born (Healthcare in Canada is free and would save the family over $50,000 in medical costs). AT THIS TIME IT IS IMPERATIVE TO NOTE THAT NOBODY FROM THE SEC OR ANY OTHER GOVERNMENT AGENCY CONTACTED OR CORRESPONDED WITH THE MOVANT ABOUT ANY MATTER. In late December, the movant drived to Canada in his mother's car and entered Canada under his own name and passport.

After residing openly under his own name for ████ months in Canada
with his Canadian wife and son in the same suburb where the in-laws
resided for over 20 years, Immigration Canada, AT THE SPECIFIC RE-
QUEST OF THE U.S. GOVERNMENT arrested and detained the movant in
maximum security "Immigration Detention" for a non-existent immigra-
tion violation that was proven after several immigration hearings
that cost the movant $15,000 in legal fees.  Although the U.S. gov-
ernment demanded the deportation of the movant, Canadian officals
determined that a deportation was not warranted and instead issued
the movant a voluntary departure order. (SEE EXHIBIT K )

Immediately therefater it was discovered that an extradition request
was made by the U.S. government based on a criminal complaint that
would not be produced until almost six years later in May of 2006.
SAID COMPLAINT DOES NOT BEAR THE NAME NOR STAMP OF A U.S. MAGISTRATE
and was said not to exist by the clerk of court, the docketting clerk,
and U.S. DOJ Freedom Of Information Act Office, and also did not
appear in a PACER search. A lawyer for the movant traveled to New
York and visited with a U.S. Attorney who could not give any details
of the charges nor a copy of the complaint. THIS COMPLAINT IS NOW
SUSPECT. (PLEASE SEE EXHIBITS C, D, E, B, I, & S ).

Back in Canada the movant was granted and posted extradition bail,
but upon the insistence of the U.S. government was detained yet another
nine months in maximum security (3 prisoners in a 6 by 9 foot cell)
During this time the movant was not allowed to attend the funeral of
his father-in-law, nor contact with his wife who suffered a miscarriage
and whose mother (Chai Jin Yum) underwent brain tumor surgery at the
Trillium Hospital in Mississauga, Ontario (the source of her migraines).
Overall, the movant was detained 16 months in maximum security detent-
ion in Canada, of which 9 of those months were declared to be "wrongful"

by a 'over-ride' of video feedback message (Toronto) at a habeas proceeding. Shortly thereafter the movant was released on the bail granted nine months earlier by Justice Garton of Ontario Superior Court. (SEE US V GALLO (2ND CIRCUIT 1996) EDNY

The missing charging documents were not available for the extradition hearing and only appeared less than one working hour before the extradition appeal was to be heard. This concealment was deliberate or so we submit, in an under-handed effort to deny due process to the movant since one cannot contest what is unknown. (SEE EXHIBIT C+I).

Without the benefit of charging documents the extradition proceedings were lost and after surrendering himself to Canadian officials, the movant was transported by U.S. marshalls to MDC Brooklyn on May 22, 2007. SELF-SURRENDER WAS MADE 3 MONTHS EARLIER ON FEBRUARY 7, 2007.

SINCE HIS ARRIVAL TO MDC BROOKLYN ON MAY 22, 2007, THE MOVANT HAS NOT BEEN ARRAIGNED, INDICTED, NOR BROUGHT BEFORE A JUDGE NOR MAGISTRATE FOR ANY PURPOSE.

This delay is unneccessary as per Rule 5 and in effect is not only impeding a speedy trial but causin irreversible prejudice for which there is no cure as well as presumptive prejudice.

## GROUNDS FOR THIS MOTION

1. The movant is presumed innocent and entitled to due process and speedy trial protections as per the 5TH, 6th and 8th Ammendments as well as Rule 5 and Section 3163. Said rights were reinforced by pertinent rulings listed below that basically states dismissal is the only appropriate relief "even if delay is not of constitutional magnitude" and "the defendant need not prove bad faith".

US V Lane (F2d, 1078 2d Circuit 1977

US V Hattrup  763 F2d 376, 377 - 9th Circuit 1985

US V Sears Roebuck  877 F2d 734, 737 - 9th Circuit 1989

U.S. V Watkins F3d. 167, 180

U.S. V McCoy  F2d, 706,  -1st Circuit  1992

Prejudiced sustained to date by defendant includes A) 18 months of maximum security confinement, 16 months of which were in a 6 by 9 foot cell shared by three prisoners. Considering the claustrophobia suffered by the the movant, such confinement was a living hell that some might consider to be "cruel and unusual punishment", if not "oppressive" for pre trial detention. (Even though 17 months of said detention was in Canada, said detention was instigated, and requested directly by U.S. officials barring which, the movant would have been released on the bail granted as per Exhibits D and K attache). B) At the direct request of U.S. officials the movant was denied a work permit in Canada for the 5.5 years he was free on bail even though he was legally entitled to said permit and had a household of five family members to support creating enormous financial burden for the entire family not to mention incredible stress and anxiety.  C)  To date the movant and his family have expended in excess of $100,000 in legal fees fighting extradition in accordance with Section 8 of the Extradition Treaty with Canada.  D)  In absencia, officials of the SEC seized the life savings of both the movant and his 73 year old mother without ever serving any notice of any hearing or even sending a letter of explanation, forcing the movat and his family to go deep in debt to raise legal fees.  To add insult to injury, the SEC did not serve the ir judgement upon the movant until months after the legal appeal period already expire d E)  The movant is the fat her of two young children age s7 and 11, the youngest of whi ch s uffers from severe separation anxiety.

2.  The movant did not "flee" from Florida to Ohio, nor from Ohio to Canada as alleged and did not receive service of any legal document, nor any correspondence, nor telephone call from ANY U.S. agency nor official therof advising of any charges pending nor laid. As well-documented in Canadian Immigration proceedings,the movant went to Ohio from Florida for "Medical Emergency" as per Exhibt D and B attached, and from Ohio to Canada for a combination of "Medical Emergency" for the mother-in-law, and death threats against him and his Canadian wife and son.  It should be noted that the Greater Toronto area has been home to the movant's wife and in-laws fo rr well over 25 years and they are all Canadian citizens.  Even if authoriti es were seeking the movant's "cooperation" in any matter, he would not be obligated to provide same as per:

MOYA V U.S.  7th Circuit (1985)  and

BROWN V TEXAS  443 US 47  (1979)

It has been well-established in both Canadian Extradition and Immigration proceedings that the movant entered Canada under his own name and passport, and living openly under his own name for more than six months in Canada before learning of his arrest warrant on June 23, 2000 when he was actually arrested at his wife's home in Canada. (THESE FACTS REMAIN UNCONTROVERTED)

3.  U.S. authorities did not execute due d iligence in preventing

the travel of the movant to Canada or in arresting him, nor in facilitating his return to the U.S. to stand trial considering that:

A)  No BOLOs were issued to border agents who three times allowed the movant to cross into Canada (December 19th, 1999), back into the U.S. (May, 2000) and back into Canada (May, 2000) using his own name and passport.

B)  Not one official even bothered to send a letter or summons to the movant prior to his travel to Canada, nor call him by telephone.

C)  Within 3 months of his arrest in Canada, the movant sent a lawyer to New York to get particulars of the charges and attempt a resolution that would effect the voluntary return of the movant who only wanted assurances of protection for he and his family in writing.  Said lawyer, in transcripts stated he was "quickly re-buffed" and unable to obtain charging documents or dollar amount, nor victims of all eged crime from AUSA Hill. The good faith effort to resolve matters and effect the voluntary return of the movant in September of 2000 were met with bad faith and a brick wall.

In view of above and following caselaw, a dismissal is also in the interests of justice;

STRUNK V U.S.  USC 412 US 434 (1973)

US V SALZMANN  548 F2d 395 2nd Circuit (1976)

DOGGETT V U.S. 1992 SCT 3745, 112S Ct. 2686, 120 L Ed (1992)

4.  The date on the missing charging documents can only be estimated by the date stamp of "September 28, 2000" yet the extradition request was made two months previous in July 2000.  So how could the movant know of his complaint in 1999 in Ohio if it did not come into existence until some nine months later ? ? ?  (SEE EXHIBIT C) ALSO EX. I

5.  According to the extradition treaty with Canada, the requesting state must certify that the evidence (documents & witnesses) are available for trial at the time the extradition request is made (in this case July of 2000). According to the extradition case record, Exhibits D, E, and H, this evidence has not been available for the last seven years, nor is it available today. Is this not bad faith?

6.  The movant has NEVER waived any of his rights and continues to assert his right to a speedy trial commencing on the day of his U.S. detention May 22, 2007 and will not consent to any further delays.

7.  Pre-trial detention to date is oppressive and already con-
stitutes a full sentence according to the old 1999 sentencing
guidelines and exceeds the Canadian maximum sentence for the same
identical conduct. Many double jeopardy cases like those below
not only prohibit double proceedings but double punishments;

BELL V. WOLFISH (SCT. 1979)
PALAZZOLO V GORCYCA  (6th Circuit - 2001)        CAMPBELL V CAUTHRON
U.S. V GALLO (2ND CIRCUIT                         (SCT. 1978)
GREEN V U.S. (SCT - 1961)
U.S. V MELENDEZ CARRION (1986 SCT)               SCHALL V. MARTIN
NORTH CAROLINA V PEARCE (SCT - 1969)              (SCT. 1984)
U.S. V. GONZALEZ CLAUDIO (2ND CIRCUIT 1986)
U.S. V AGUILERA (8th Circuit - 1999)
LAREAU V MANSON (2ND CIRCUIT 1981)
U.S. V KOONCE (10th Circuit - 1991)

8.  Six credible alibi witnesses including a doctor, dentist, and
others with no criminal records established that information in
the   complaint is not accurate, and a seventh such witness was
just located this week in the form of a real-estate agent(Ohio).

9.  The movant professes his innocence and is not inclined to
entertain a plea agreement.  His intentions are to clear his name
by trial and return to his family in Canada. The movant under
-stands how Exhibit N may have caused some over zealous agents
to jump the gun and bears no ill will towards any US. officials.
He now only wants to salvage his disrupted life and reunite with
his family.

10.  Since his arrival at MDC Brooklyn, the movant has requested
both verbally and in writing multiple times to make 1 confident-
ial unmonitored legal calls to his attorney in Canada and has
been repeatedly denied/ignored for the last 30 days.  Likewise,
he has not been outdoors at all during this entire period.

11.  There is also a humanitarian consideration... The movant is
the only adult male in his household of  3. women, one of whom
is permanently disabled (from the brain tumor removal surgery)
and a young child. The family lives in a wooded area on a street
with only 6 occupied homes, 2 of which were victimized with a
home invasion and burglary and they now live in constant fear and
anxiety, especially considering the previous death threats made
to the family (as explained in Exhibit D)

12.  The movant has never refused to assist authorities and would
probably do so now if able to do so from the safety of Canada where
he can protect his family. This has always been the position and
concern of the movant given the violent murder of his former assoc-
iate who was brutally executed as per EXHIBIT O.

Page  8

13. The movant has been detained more than 30 days with no arraign-
ment, indictment, nor any other appearance before the Court in
violation of Rule 5, 8th Ammendment due process rights as re-
inforced by the below case law;   **ALSO 5TH AMMENDMENT**

RIVERSIDE V MC LAUGHLIN  (SCT  1991)

VILLANOVA V ABRAMS (7th Ciicuit 1992)

U.S.   V   MARION   (SCT   1971)

~~U.S. V GEBRO (9th Circuit 1991)~~

~~BROUSSARD V PARRISH OF ORLEANS (5th Circuit 2003)~~

~~U.S. V CISNEROS (10th Circuit  2003)~~

\* The government has had 7 years to prepare for trial, and the
movant should have been arraigned within 48 hours of U.S.
detention (May 22, 2007) with a 10 day allowance for "reason-
able delay".  The current 30+ days without an appearance is
more than unreasonable. If in fact the government is only now
conducting their investigation, then their extradition request
was unquestionably made in bad faith.

14. The movant is to be protected with "Equal Protection of Law"
as per the U.S. Constitution. False prosecution is persecution
and one should not be detained unless a timely prosecution is
to follow.  (See HYDRICK V HUNTER 9th Circuit - 2006)

15. This honorable Court has jurisdiction to rightt this wrong
as per DISCOVERY HOUSE V CITY OF INDIANAPOLIS which said and
held "A federal Court can use any appropriate remedy to right
a wrong".  (7th Circuit - 2003)

16. The movant who is "presumed innocent" has always been detained
in maximum security conditions, a punishment he would not receive
even if found guilty.  This environment is not only extremely
stressful but extremely violent. In Canada the movant was assault-
ed by another prisonerwi without provocation simpley becaue he
"looks like a cop".  Within the last week the prisoner who sleeps
next to him was assaulted in the middle of the night, had his
jaw broken and two teeth knocked out because he was believed to
be  "a snitch".  It is respectfully submitted that the movant did
nothing to deserve being subjected to such fear and threat of
personal harm 24-7.(SEE BELL VS. WOLFISH & US VS GALLO)

17. While on 5.5 years of bail in Canada pending extradition, the
movant was subjected to extremely stringent bail conditions that
required daily reporting by telephone, personal reporting week-
ly and a curfew. HE  COMPLIED  FULLY  WITHOUT BREACH DURING THE
ENTIRE PERIOD HE WAS FREE ON BAIL.  Also, at various stages of the
extradition process, the movant was asked to self-surrender himself before
rulings were handed down from the Courts. ON ALL THREE OCCASSIONS THAT HE
WAS ASKED TO SURRENDER HIMSELF, THE MOVANT DID SO PUNCTUALLY WITHOUT INCIDENT.

18. Throughout Immigration and Extradition proceedings in Canada, every prosecutor and Court (WITHOUT EXCEPTION) conceded and ruled that the movant was NOT a flight risk, danger to society, nor at risk to reoffend. Consequently he was released on bail under the supervision of his wife.

19. At present, friends, neighbors, and relatives in Parma, Ohio have offered to act as security/surety for bail and one relative has offered to pledge a home with free equity value of $100,000 as security for bail. Another neighbor in Parma has offered to reside with the movant : if his wife is not suitable surety for bail. If this matter is not dismissed, bail is requested in accordance with the following which guarantees the right to "reasonable bail":

    8th Ammendment - U.S. Bill of Rights

    U.S. V GEBRO  (9th Circuit - 1991)

    BROUSSARD V PARRSIH OF ORLEANS (1991 - 5th Circuit)

    U.S. V CISNEROS  (10th Circuit - 2003)

20. During the course of extradition proceeding and Immigration proceedings in Canada, and following a visit to the movant by four U.S. officials, it was learned that the true purpose of the deportation and extradition request was to induce, persuade, compel, coerce (depending on your perspective) the movant to cooperate in another criminalmatter. Ironically, such pressure was not required since the movant previously agreed to cooperate from the safety and sanctuary of Canada because of previous threats made to him and his wife and the muredr of his busineess associate (SEE EXHIBITS A,K,B & O). One of the visiting agents further told the movant that if he continued resisting his extradition, more charges would continue to accumulate until he capitulated. True to his word, one count of attempted wire fraud grew into six over the years and securities fraud was also added by 2006.

21. "Attempted Wire Fraud" is not an extraditable offense according to the Extradition Act and TReaty of Canada. The U.S. had to change the crime to be successful in their extradition.

22. Over the last seven years the U.S. government has not been able to identify any victim(s) amount of dollar loss or other deprivation of the alleged fraud. During this time three exculpatory witnesses of the movant have died and a fourth is now 76 years old and in failing health. A thorough review and careful reading of the missing cpmplaint and attached exhibits should warrant a dismissal of this cause with prejudice.

Page 10

INDEX OF EXHIBITS

ITEM   DESCRIPTION

| ITEM DESCRIPTION | EXHIBIT |
|---|---|
| Sworn statement of witness Perez | A |
| Sworn statement of movant's wife | B |
| Missing Criminal Complaint | C |
| Sworn report of expert witness & veteran private eye | D |
| Sworn affidavit of Attorney David Wolckenstein | E |
| Death certificate of Martha Gorcyca | F |
| Passport of movant | G |
| Letter from private investigator | H |
| Letter from Attorney Greg Lafontaine | I |
| Letter from New York Clerk of Court | J |
| Sworn statement of Attorney Marshal Drukarsh | K |
| News article about movant | L |
| Letter from Dr. Luis Aponte | M |
| ABC News summary — Orgin of confusion | N |
| News article about murder of business associate | O |
| Marriage certificate of movant | P |
| Letter from investigative newspaper reporter | Q |
| Letter from Law Professor | R |
| Reply to FOIA request | S |
| Sworn affidavit of Canadina Police Officer Bailey | T |
| Excerpts from Extradition Court transcripts | U |
| Resume of movant | V |
| Statement from movant's family | W |
| Statement from alibi witness 1   (Reserved pending counsel) | X |
| Statement from alibi witness 2   (Reserved pending counsel) | Y |
| Statement from alibi witness 3   (Reserved pending counsel) | Z |

*Note: Since three previous witnesses were intimidated and
threatened (AS CONFIRMED IN EXHIBIT D) movant needs
to consult with legal counsel before revealing ident-
ies of any further witnesses.

EXHIBIT A

# SWORN STATEMENT OF MAGALY PEREZ

Please let this serve to confirm that I Magaly Perez am a citizen of Ecuador and that for seven years I was married to one Bruce Anthony Gorcyca DiMarco. During these seven years, we resided at 301 174th Street, Unit 2318, which is owned by my parents. We split up in the fall of 1997 and Bruce moved out of our condo. After the fall of 1997, I would only see Bruce on weekends and holidays when he came to pick up our daughter Dominique. Until the fall of 1997, Bruce maintained a small home office in our condo but did not use it after he moved out.

In late July of 1999, several FBI agents came to my condo and pushed their way in as soon as I answered the door. They did not show me any search warrant or even said they had one when they entered. They said they were looking for "Gaston Cotto" who is my father and resides in Ecuador most of the time. They then search each room for about four hours before one of the agents came with an envelope and said it was a search warrant. They did not show me the papers so I don't know what they were really. They removed several boxes of Bruce's old paper's our family's computers and fax machine amongst other things but they did not give me a receipt for what they took.

Just before they left, my telephone rang and one of the male agents, a short man with dark hair, and about 35 years of age answered the phone. He said it was Bruce and maybe it was or maybe it wasn't. I did hear the agent say something like "You better come and talk to me right away or you'll be a defendant instead of a witness". The conversation was very short and no longer than two minutes long. I have no idea what the caller was saying to the FBI agent.

While Bruce lived at our condo, he was legally employed as a Sales Manager at Champion Marine in Miami where he sold boats and later (1995-1996) at American Financial Group located at 2876 N.E. 191st Street in Aventura which was owned by a Mr. Edward Chism Sr. who I met a few times and can identify. I never saw Bruce do anything illegal and he has been a very good father to our daughter. I make this statement voluntarily, under oath, to the best of my recollection, this ____ day of November, 2001.

_[signature]_
Magaly Perez c/o
Atty. George Villa
1221 Brickell Avenue – 10th Floor
Miami, Florida 33131

Sworn and subscribed before me, a public notary this 7th day of ~~November,~~ December 2001 by Magaly Perez as identified by her passport and/or other photo ID.

Public Notary: _[signature]_

Yuslmy Bordes
My Commission DD019518
Expires April 22, 2008

TOTAL P.01

In the City of Mississauga, Ontario

**SUPPLEMENTAL SWORN STATEMENT OF**          November 16, 2006
**JI HAE LYNDA YUM GORCYCA DIMARCO**

I Lynda Gorcyca DiMarco, a Canadian citizen, a current legal resident of Mississauga, being of major age, having been sworn, do hereby declare under oath to the following facts and events of which I have personal knowledge:

1.      I have been married to Bruce Anthony Gorcyca DiMarco since October of 1998 and together we have a son who is a Canadian citizen.

2.      I personally made the copies and helped my husband bind most of his many pro-se filings to the Minister of Justice in Ottawa of which I believe there were nine volumes. I do recall that the last one we sent was dated December 5th, 2005 and I recall this one for two reasons. It was the only submission that my husband sent 2 CD ROM disks as exhibits including audio recordings, and it was one that I had difficulty mailing off. Specifically, it was about 3 inches thick and would not fit in the courier envelope and after I found a box and returned, I realized the pick-up had already been made. I consequently went over to the post office and mailed it to the Minister in Ottawa. I always made an extra copy of everything filed for my husband.

2.      I was present when my husband dropped of his copy of this filing at Attorney Gregory Lafontaine's office and the later retrieved it with a box of Appeal books at Attorney Markin's residence. I heard Mr. Markin tell my husband that he wanted to use only a few exhibits from the last filing and was upset with my husband that the audio recordings were not transcribed onto paper. My husband replied that we simply did not have the money to do that.

3.      I recall that there was only one set of appeal books that my husband had to take back and forth and everybody just assumed that because there were so many of them, everything just had to be there. We did not know anything was omitted until Mr. Markin tried to introduce the hand written letter my husband tried to hand to the judge at the Extradition hearing and the woman judge said she did not see the letter in the appeal books and therefore would not allow it to be entered.. After the hearing my husband and I went through all the appeal books and noticed that the last filing was somehow omitted. I recall that my husband told both Mr. Lafontaine and Mr. Markin about this and Mr. Markin said it was Mr. Lafontaine who needed to inform the court and I heard Mr. Lafontaine say he would "Send a letter to the court advising them of the omission". I have no way of knowing if he did so or not.

1

copy of his "charging documents" which my husband never saw until the day before the appeal. Justice Rosenberg seemed like he didn't believe the charging documents had not been provided but when he asked Mr. Reitz if he would provide a copy of these documents to my husband, Mr. Reitz said he would do so after he himself obtained a copy "from Ottawa" admitting that he had not yet received the documents himself.

8. Sometime in the first week of June of 2004 I went downtown with my husband to file a motion at the Court of Appeals at Osgoode Hall that he prepared himself titled "Notice of Motion To Obtain Charging Documents" but the clerk told my husband that his lawyer had to file this motion on his behalf and refused to accept it. My husband insisted that he did not have any lawyer representing him but the clerk said the computer indicated that Solicitor Gilmour was still showing as his counsel. My husband explained that Solicitor Gilmour had been removed months ago but I guess the clerk did not believe him because she refused to accept the motion for filing.

9. In the eight years I have been married to my husband, I have never once seen or learned of him doing anything illegal, unethical, or immoral and the only dispute he has had with anyone during these eight years has been his former lawyer Bill Gilmour. My husband did not owe any money to anyone before he had to hire lawyers for this extradition and I know of nobody that claims my husband ever cheated, misled, or stole from them.

10. I can confirm that Justice Doherty revoked my husband's bail and sent him to jail for two weeks about nine months ago because Solicitor La Fontaine did not get his appeal filed on time and a special Purge Court hearing was called. I thought this was very unfair to punish my husband because he had no control over how fast his lawyer worked and my husband regularly called him for updates. I wanted my husband to fire Mr. Lafontaine because of that incident but my husband refused to do so, mostly because he did not have more money for a new lawyer and partly because he accepted the explanation for the lapse from Solicitor LaFontaine who he still respects and trusts. Overall, my husband has spent eleven months in jail here in Canada for something I personally know was impossible for him to have done because of where he was and when. For example, I met my husband in Hong Kong during a time period that FBI agent said he was sending faxes from his old home in Miami where he hadn't lived for over a year. The stamps in my husband's passport and the Kimberly Hotel guest log in Kowloon where he stayed would prove this if anyone is willing to check.

11. In October of 1999 my mother, sister, and one month old son were with me at my mother-in-laws's house in Parma, Ohio when three FBI agents

3

WHERE IS
JUDGE'S STAMP?

EXHIBIT C

1

EC:TYH:sjw
F. #
Grcyapt3.wpd

**FILED**
IN CLERKS OFFICE
U.S. DISTRICT COURT E.D.N.Y,

★ **SEP 28 2000** ★

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

BRUCE ANTHONY GORCYCA,
  also known as "Anthony DiMarco,"
  also known as "Tony Dimarco,"
  also known as "Tony DeMarco,"
  also known as "Tony D. Marco,

        Defendant.

- - - - - - - - - - - - - - X

A M E N D E D
C O M P L A I N T
99-M-1485
(T. 18, U.S.C., §§ 371,
1343 and 2; T. 15,U.S.C.
§§ 78j(b) and 78ff)

     JAMES CRONIN, being duly sworn, deposes and says that

he is a Special Agent with the Federal Bureau of Investigation

duly appointed according to law and acting as such.

     In or about and between October 1997 and June 1999,

both dates being approximate and inclusive, within the Eastern

District of New York and elsewhere, the defendant BRUCE ANTHONY

GORCYCA, also known as "Anthony DiMarco," "Tony Dimarco," "Tony

Demarco," and "Tony D. Marco," together with others, did

knowingly and willfully conspire, directly and indirectly, (1) to

devise a scheme and artifice to defraud, and for the purpose of

executing such scheme, transmit and cause to be transmitted in

interstate writing, signs, signals and pictures by wire

3

to be transmitted in interstate writing, signs, signals and pictures by wire communication, to wit,

| Approximate Date of Transmission | Description | Recipient |
|---|---|---|
| June 1, 1999 (305) 935-3539 | Prudential Letter | Concord Investment Co. Chicago, IL |
| June 1, 1999 (305) 935-3539 | Prudential Letter | Uniplan, Inc. Milwaukee, WI |
| June 3, 1999 (305) 935-3539 | Prudential Letter | Penn Center Investments WestConshohocken, PN |
| June 4, 1999 (305) 935-3539 | Prudential Letter | Becker Capital Portland, OR |
| June 4, 1999 (305) 935-3539 | Prudential Letter | Blackford Securities White Plains, NY |
| June 8, 1999 (305) 935-9393 | Prudential Letter | T.R. Craig Minneapolis, MN |

(Title 18, United States Code, Sections 1343 and 2).

In or about and between October 1997 and June 1999, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BRUCE ANTHONY GORCYCA, also known as "Anthony DiMarco," "Tony Dimarco," "Tony Demarco," and "Tony D. Marco, knowingly and willfully, by use of means and instrumentalities of interstate commerce and the mails, directly and indirectly did use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission (Title 17, Code of Federal Regulations, Section 240.10b-5), in that he did (a) employ devices, schemes

made, not misleading; and (c) engage in acts, practices and
courses of business which would and did operate as a fraud deceit
upon members of the investing public and other securities firms,
in connection with purchases and sales of securities of
TMANglobal.com, Inc.

(Title 15, United States Code, Sections 78j(b) and
78ff).

In or about and between October 1997 and June 1999,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendant BRUCE ANTHONY
GORCYCA, also known as "Anthony DiMarco," "Tony Dimarco," "Tony
Demarco," and "Tony D. Marco," knowingly and willfully, by use of
means and instrumentalities of interstate commerce and the mails,
directly and indirectly did use and employ manipulative and
deceptive devices and contrivances in violation of Rule 10b-5 of
the Rules and Regulations of the United States Securities and
Exchange Commission (Title 17, Code of Federal Regulations,
Section 240.10b-5), in that he did (a) employ devices, schemes
and artifices to defraud; (b) make untrue statements of material
facts and omit to state material facts necessary in order to make
statements made, in light of the circumstances under which they
made, not misleading; and (c) engage in acts, practices and
courses of business which would and did operate as a fraud deceit
upon members of the investing public and other securities firms,

78ff).

In or about and between October 1997 and June 1999, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BRUCE ANTHONY GORCYCA, also known as "Anthony DiMarco," "Tony Dimarco," "Tony Demarco," and "Tony D. Marco, knowingly and willfully, by use of means and instrumentalities of interstate commerce and the mails, directly and indirectly did use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission (Title 17, Code of Federal Regulations, Section 240.10b-5), in that he did (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make statements made, in light of the circumstances under which they made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud deceit upon members of the investing public and other securities firms, in connection with purchases and sales of securities of Converge Global, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff).

In or about and between October 1997 and June 1999, both dates being approximate and inclusive, within the Eastern

duties, I am familiar with cases involving frauds perpetrated through the use of computers and Internet technology.

　　　　2.　The following information set forth in this affidavit is known to me personally, or was reported to me by other law enforcement officers, officials of the Securities & Exchange Commission ("SEC"), civilian witnesses involved in this investigation, or is information I have learned through examining documents, records and other physical evidence. Except as otherwise noted, I have not differentiated herein between facts of which I have personal knowledge and facts that were reported to me by others. Since this affidavit is being submitted for the limited purpose of seeking an arrest warrant, I set forth only facts relevant to the determination of probable cause, not each and every fact learned during the course of the investigation.

<u>OVERVIEW OF THE SCHEME</u>

　　　　3.　This investigation has revealed that the defendant BRUCE ANTHONY GORCYCA, also known as "Anthony DiMarco," "Tony Dimarco," "Tony Demarco," and "Tony D. Marco," runs a company called The Globus Group ("Globus") as a fraudulent enterprise, and that the defendant's business at Globus is devoted in a large part to manipulating the stock price of small public companies through various fraudulent means.

　　　　4.　The Globus Group has a web site on the Internet, "Globusgroup-com," on which the defendant advertises and

convey inside information to "Alex" about a major business announcement that would be made shortly by Top Image Systems, and urges Alex to buy stock in the company before the announcement is made. In fact, the letter is entirely phony, and approximately nine different people reported to the SEC that they had received this letter by fax in late October or early November 1997. The letter was faxed to these individuals for the apparent purpose of fraudulently inducing these individuals into believing that they had accidentally received important inside information about Top Image Systems that was intended for someone else, and with the intent that these individuals would they buy stock in this company, driving up its price. When word of these letters got out, Top Image Systems then issued a statement saying that the information was wrong and that the company had nothing to do with whoever wrote the letter. In fact, as telephone records show (see paragraph 17 below), these faxes were sent by the defendant from his home in Miami, Florida.

6.   The investigation reveals that the defendant has been sending such fraudulent letters by fax from at least as early as October 1997 until June 1999, all in an attempt to manipulate the stock price of various small companies. One such letter, which was faxed to dozens of individuals in June 1999, appeared to be written on "Prudential Securities" letterhead and was marked "CONFIDENTIAL." Also, the letter bore the signature

Thus, this phony letter was sent out for the purpose of inducing many people to think they had inadvertently received a private communication containing important inside information about the three companies mentioned.  As demonstrated below (see paragraph 18 below), it was the defendant who faxes this phony letter all these people.

7.  The phony " Prudential" letter above mentions the names and/or stock ticker symbol for three companies, China Food and Beverage Company (CHIF), Tmanglobal.com Inc. (CHOP) and Transglobal Holding, Inc. (TGHI).  Investigation indicates that this letter is part of a coordinated effort by the defendant to obtain stock in these companies and then profit from artificially and fraudulently inflating the price of their stock.  Also, this scheme is consistent with the way the defendant markets the services of the Globus Group on the company's web site.  I.e., touting the ability of the Globus Group to use faxes and e-mails to "blanket the country" with promotional material that will supposedly double the price of a company's stock within 45 days.

8.  Investigation has revealed that China Food and Beverage Company ("China Food"), Tmanglobal.com, Inc. ("Tmanglobal") and Transglobal Holdings, Inc. ("Transglobal") all were approached by the defendant and offered, among other things, stock promotion and "investor relations" services in exchange for stock in the company.  Also, I have reviewed a

favorable press releases about their stock.

10. On the Globus Group web site, the defendant touts his ability to obtain assets for companies in language that barely disguises its fraudulent purpose. There is an "Asset Enhancement" page of the site, but the page does not discuss Globus's ability to help companies obtain assets they need. Rather, the page suggests that what Globus does is give companies a way to <u>say</u> that they have acquired a valuable asset. The page reads as follows:

> Does your company need Asset Enhancement to go public or to move up NASDAQ ladder to Small Cap?
>
> We can arrange to transfer up to $4MM of assets to your public company in exchange for equity and a nominal fee. You will even be given an option to buy back some of the equity. Our assets are real and hard permanent assets (TV air time) that will withstand any audit, and even can be resold if not utilized ...

In May and June 1999, China Food, Transglobal, and Tmanglobal, the three companies mentioned in the phony "Prudential" fax, issued identically worded press releases, the form of which they say was provided to them by the defendant, announcing their plans to acquire this same asset, i.e., $4 million worth of TV air time. Individuals from China Food and Transglobal have told the SEC that the defendant told them to contact an associate of the defendant's in New York City to obtain this "asset," but that they have been either unable to reach the defendant's associate

designed to make the recipient think he or she has inadvertently
received a private communication containing inside information.
This letter begins, "I just spoke with the lawyer and it is a
done deal. We're good to go on the three deals below, all of
which will be making major announcements this week and next."
The letter goes on to say that China Food will be announcing a
large acquisition soon and is closing a deal to distribute
Budweiser beer in China. (A representative from Budweiser
recently informed the SEC that Budweiser has never had any
business dealings with China Food.) The letter also states that
North Wave will be expanding into 37 countries and announcing two
acquisitions in the near future, and that a company called
Lasertec just received "a ton of financing" and will be having a
"major" press conference shortly. Still another phony letter
faxed to various people by the defendant is written on the
stationery of the "Skydome Hotel" in Toronto and is addressed,
"Hey Amigo." This letter advises the recipient to buy stock in
Chill Tech, Lasertec and Converge" before the insiders run up the
price on us."

## EVIDENCE OF PARTICULAR FRAUDULENT FAX COMMUNICATIONS

A.   The Defendant's Identity

13. The Globus Group web site identifies the President
of the Globus Group as Anthony DiMarco. Also, I have obtained
letters on the Globus Group letterhead and other documents which

the SEC recently spoke to an individual who works for a company
in Florida called American Financial Group, Inc., which employed
Anthony DiMarco in 1994 and 1995. This individual stated that
during DiMarco's employment with American Financial Group, he
lived at the Apartment.

16.   The Globus Group web site has a section entitled
"NASDAQ Shells." On one page of this section the defendant
instructs web site visitors who want summaries of the Globus
Group's NASDAQ shell companies to fax their requests to the
telephone number (305)935-3539. Telephone records obtained from
Bell South indicate that this number is subscribed to in the name
"Gaston Cottoll" at the address of the Apartment. Evidence shows
that a number of the phony I letters described above were faxed
from this telephone number or from other telephone subscribed to
at the Apartment.

B.   The Letter About Top Image Systems

17.   For example, in 1997 several people reported to
the SEC that they received the phony letter about Top Image
Systems (described in paragraph 5 above) on their fax machines on
October 31, 1997. Telephone records showing incoming calls to
four of these fax machines reveal that all four fax machines
received calls on October 31, 1997 from the number (305)935-3539
on October 31, 1997. Two other individuals reported to the SEC
that they received this same phony letter on their tax machines

receiving the fax, he dialed "STAR 6911" and was informed by the telephone company that the fax originated from the number (305)933-9393, which, according to telephone records, is another number subscribed to in the name Gaston Cotto at The Apartment.

e.   On June 9, 1999, an individual named Phillip Berger in Florida reported to the SEC that he had received the phony "Prudential" letter at his fax machine. Telephone records show a call from (305)935-3539 to Berger's fax number on June 9, 1999 at 7:37 a.m.

f.   In June 1999, an individual named Alan Richter in Florida reported to the SEC that he had recently received the phony "Prudential" letter at his fax machine.  Telephone records show a call from (305)935-3539 to Richter's fax number on June 9, 1999 at 1:13 a.m.

g.   One June 8, 1999 an individual named Sal Hazday at Zapata Industries in Coconut Grove, Florida reported to the SEC that his company had received the phony "Prudential" letter at their fax machine. Telephone records show a call from (305)935-3539 to the Zapata Industries fax machine on June 7, 1999 at 10:17 p.m.

h.   On June 1, 1999, a company named Uniplan, Inc. in Milwaukee, Wisconsin reported to Prudential that the company had received the phony "Prudential" letter at their fax machine.  Telephone records show a call from (305)935-3539 to the Uniplan fax machine on June 1, 1999 at 2:59 a.m.

i.   On June 4, 1999, a company named Blackford Securities in White Plains, New York, reported to Prudential that the company had received the phony "Prudential" letter at their fax machine. Telephone records show a call from (305)935-3539 to the Blackford fax machine on June 4, 1999 at 5:25 a.m.

D.   The Communications Concerning IO Management Corp.

19.   In addition to the fraudulent fax communications sent by the defendant described above, a number of individuals

identically worded notation, as does the "Market Research Analyses" about IQMG, which states across the top, PLEASE Deliver to VIP/Presidential Suite Immediately Upon Receipt. More important, however, telephone records confirm that the IQMG faxes were sent by the defendant. For example, a company called "Your Discount Broker" in Boca Raton, Florida reported to the SEC that it had received the IQMG faxes in January 1999. Bell South records show a call from the number (305) 935-3539 (the same number at the Apartment from which many of the phony "Prudential" faxes were sent) to Your Discount Broker's fax machine on January 20, 1999 at 6:39 p.m.

### THE DEFENDANT'S METHOD OF SENDING FAXES

21. I believe that the defendant uses computer equipment and computer programs, among other things, to send out the fraudulent faxes described above. First the defendant's agreement with China Food states that Globus Group sends a "minimum" of 5,000 faxes per day as part of its "fax blast" strategy. Also, telephone records for the telephone (305) 935-3539, the number at the Apartment from which the fraudulent faxes described above were sent, indicate that in January 1999 (when the IQMG fraudulent faxes were sent out), and in early June 1999 (when the fraudulent "Prudential" faxes were sent out), this telephone was making nearly one call per minute for days at a time. Based on my knowledge of computers, and in particular on

.fraudulent IQMG faxes per day in January 1999.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant BRUCE ANTHONY GORCYCA, also known as "Anthony DiMarco," "Tony Dimarco," "Tony DeMarco," and "Tony D. Marco," so that he may be dealt with according to law.

JAMES CRONIN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
20th day of September, 2000

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

WHERE IS JUDGE'S NAME?

A TRUE COPY
ATTEST
DATED 7/28 2000
ROBERT C. HEINEMANN
BY _____ CLERK
DEPUTY CLERK

**EXHIBIT D**

In the city of Toronto, Ontario

## SWORN DECLARATION OF
## PRIVATE INVESTIGATOR ED REIKEN

I Edward Reiken age 57, a Canadian citizen, a legal and current resident of Toronto, Ontario having been duly-sworn do hereby declare under oath that:

1) I am a licensed private investigator operating in the Province of Ontario under license no. 238157 since 1973 with clients both in Canada and the United States. I specialize in criminal fraud cases and related forensic audits and have testified as an expert witness in dozens of fraud cases.

2) I was hired on behalf of Bruce Anthony Gorcyca DiMarco of Mississauga who is the subject of an extradition request of the United States government suspected to be wrongful in nature to **"address the reliability and credibility of evidence presented against Mr. Gorcyca DiMarco in the current extradition matter".** I subsequently had to review courts files, public records, sworn statements, news archives, court transcripts, Immigration transcripts, and interview witnesses, and having completed same can accurately conclude the following based upon what I learned through the course of my investigation:

A) **That Mr. Gorcyca DiMarco has not been indicted for the alleged crime(s) listed in the U.S. extradition request** and pertinent "case record" and "supplemental case record" authored by an FBI agent and filed with the Minister of Justice as reflected by Ontario Superior Court case No. E-19-00, which I have examined in depth. (Adduced by reviewing correspondence of Attorney Joseph Carter, a PACER electronic courthouse search in the U.S. court of jurisdiction, and verification with the Clerk of Court's office at the U.S. court of jurisdiction, and recent sworn statement of Atty. David Wolkenstein)

B) That listed witnesses named James Tilton and Jacques Verhaak "expected to testify" as per the case record **never even met Mr. Gorcyca DiMarco or with any person employed with the Globus Group** and are unable to identify him by sight nor voice. I spoke directly with Mr. Jacques Verhaak by telephone at his Memphis, Tennessee residence and in our conversation, he stated that <u>he never once, met nor spoke with Anthony DiMarco nor Bruce Gorcyca, or any other person from The Globus Group and would not be able to identify him by sight nor voice, and could not be expected to testify against someone he doesn't know.</u> I spoke with Mr. James Tilton by telephone who also stated emphatically that he <u>never met Mr. DiMarco and would not be able to identify him by sight nor voice and is not in a position to testify against him.</u> (Adduced after I spoke to each of these witnesses personally on November 14th and 15th, 2006 respectively).

1

Avenue in Parma, Ohio on October, 1999, and after personally
reviewing another copy of said manuscripts)

G) That Mr. Gorcyca DiMarco has a documented history of whistle-
blowing and community activism since the mid 1970s and one
such crime reported to the FBI in 1998 involving investment fraud
and money laundering of American Financial Group of Florida, that if
acted upon in a timely manner by the FBI in 1998 would have prevented
Canadian investors from being swindled out of $43 million as reported by
the Toronto Star in 2002. I counted 24 such crimes and/or corrupt acts, of
which six are sufficiently documented to the point of substantial
credibility. (Adduced after reviewing correspondence files of the person
sought, statement of Dr. Luis Aponte, pertinent news archives, phone bills,
fax logs, emails, and recorded telephone conversations with one FBI
Special Agent Maury Berthon who was assigned to the FBI Miami Field
office in 1998 and based on Mr. Gorcyca DiMarco's report, opened a
criminal investigation of American Financial Group).

H) Four friends and/or business associates of Bruce Anthony Gorcyca
DiMarco all died unusual and other than natural premature deaths within a
four year time period of each other (Canadian John Pierre Gonyou,
American Alain Chalem, American Scott Galin, and American Jeff Mertz)
and all were involved in a secret off-shore stock transaction on behalf of
two known and high-ranking U.S. officials, one of whom was recently
indicted On corruption charges in Texas. (Adduced after reviewing
numerous news archives, death certificates, correspondence files, coroner
reports, and speaking with two eyewitnesses). The deaths all took place
between November of 1999 and November of 2003. Said deaths include
an execution-style shooting, ostensible drug overdose, alleged suicide and
private plane crash.

I) Mrs. Martha Gorcyca, the mother of Bruce Anthony Gorcyca DiMarco
also died under very suspicious circumstances on the day she was to be
released from a hospital. Mrs. Gorcyca was a witness to the intimidation
and threats received by her son. (Adduced upon reading the statement of
Michael Tober and speaking with two eye witnesses who resided in
Parma, Ohio at the time and were close friends of Mrs. Gorcyca).

J) Mr. Gorcyca DiMarco and his wife received multiple death threats while
in Miami and Ohio during 1999 to the effect that if they did not leave the
country (USA), personal harm would come to them and their then unborn
child. More subtle but ominous threats were also received while they
resided in Canada and were reinforced by two visits to their Mississauga
home by a man the RCMP and FBI have identified as "multiple murder
suspect" and "active member of organized crime". The threats were
serious and real enough that a RCMP Superintendent became involved,
and personally advised both Mr. and Mrs. Gorcyca DiMarco to "take the
threats very seriously" and provided the couple with his personal cell and

3

granted by Ontario Superior Court Justice Garton.   During this same period he was allowed no physical contact with his wife, infant son nor was able to attend the funeral of his father-in-law. During this same period his wife suffered a miscarriage and his mother-in-law underwent brain tumor surgery at Trillium Hospital. During this same time Mr. Gorcyca DiMarco was visited by four U.S. officials including two FBI agents. (Adduced after reviewing sworn statements of Solicitor Marshal Drukarsh, correspondence of former counsel Gilmour, Immigration transcripts, bail documents, and interviews with three eye witnesses)   Solicitor Drukarsh also confirmed for me that over four days of bail hearings it was discovered by the court that the U.S. government was feeding the Crown information known to be false in an effort to keep Mr. Gorcyca DiMarco detained without bail. From sworn and unsworn statement from two former solicitors who represented Mr. Gorcyca DiMarco in this matter I confirmed that both agents of the FBI (John Morley & Greg Coleman) and a USA Attorney Ron White verbally agreed to protect Mr. Gorcyca DiMarco and his family if he voluntarily returned to the U.S. but when said officials refused to reduce same proffer into writing, both Mr. Gorcyca DiMarco and his two former counsels considered the proffer to be a false inducement merely to gain custody.   Further said officials refused to explain how they would protect the Canadian wife and family of the person sought since they indicated no desire to ever return to the U.S. after the October/99 incident in Ohio in which agents pointed loaded guns at the 64 year-old mother-in-law holding the one month old son of the person sought.

N) At least three exculpatory witnesses for Mr. Gorcyca DiMarco have been directly threatened or otherwise intimidated not to help Mr. Gorcyca in any way or face deportation, tax audits, or other "problems" of their own by federal law enforcement agents of the U.S. Government. One of these witnesses included a Canadian citizen. (Adduced after reading sworn and unsworn statements of Ty West, Marilyn Medina, and Andy Kim)

O) That Mr. Gorcyca DiMarco is a skilled, talented, and articulate writer and author of dozens of editorials and articles that have been published in magazines and newspapers around the world for many years.  Some of these articles are extremely critical of U.S. foreign policy or otherwise embarrassing to the U.S. government such  as Mr. Gorcyca DiMarco's current efforts to ascertain a civilian casualty count in Iraq and obtain organ transplants for Iraqi children maimed in the controversial war.  His writings date back to the 70s as does his community activism in many volunteer organizations including the American Red Cross, Salvation Army, and those he founded or chaired including The Ramey Community Council, American AIDS Alert Association, and Veteran Organ Donors International., and his once active role as a certified AIDS counselor in Florida. Mr. Gorcyca DiMarco is an honorably discharged military veteran of the U.S. Coast Guard who enlisted during the Vietnam War. (Adduced by reviewing numerous published articles by or about Mr. Gorcyca

5

**R)** **Despite an exhaustive search, I cannot find any indication of an actual victim(s), nor the dollar amount of loss or gain of the alleged wire fraud supposedly committed by Mr. Gorcyca DiMarco, nor could I find his name on any news release mentioned in the case records.** All of the said news releases were issued by the public companies named in the case record. On the contrary, published records of the SEC proceedings against James Tilton and Jacques Verhaak, clearly state that both of these individuals admitted they themselves released all of the fraudulent news releases in question, not Mr. Gorcyca DiMarco as suggested in the case record.

**S)** In my investigation of this matter I notice that the case records contradict themselves as to the address of The Globus Group, in that it cites a web site that lists one address, letterhead that bears another, and then suggests the condominium of Gaston Cotto was a Globus home office as well. I also noted that none of the correspondence in the case record on alleged Globus letterhead that allegedly originated with Mr. Gorcyca DiMarco bore any signatures and a there was no telephone bills submitted that could link Mr. Gorcyca DiMarco to any criminal activity. No mention is made in the case record that The Globus Group shut down by U.S. law enforcement in New York had no links, or affiliations with the Miami Globus Group even though ABC News made the distinction in a published broadcast to avoid a law suit from Mr. Gorcyca DiMarco **whose company had no complaints, criminal or civil filed against it in any jurisdiction nor with the Better Business Bureau, Federal Trade Commission, or the SEC, as confirmed by a record check and Internet search.** Through an interview with an eyewitness and telephone records, I was able to ascertain that the Globus Group in Miami voluntarily ceased operations at the same time Mr. Gorcyca DiMarco's Mother was hospitalized in April of 1999 when he immediately left Florida to attend to her in Ohio which was before the SEC took any actions or indicated there were any issues involving the Globus Group. This was further confirmed by dated postal mail that was "returned to sender – recipient no longer at address" addressed to Mr. Gorcyca DiMarco at the Miami Globus office on Brickell Avenue at the time period in question.

**T)** I noted with special interest during the course of my investigation that **no evidence of charging documents ever surfaced over a six year period** until only one working hour before the appeal was to be heard. I noted many verbal and written requests as far back as 2000 were made for these same charging documents by Mr. Gorcyca DiMarco, Solicitor Marshal Drukarsh, and Solicitor Gregory LaFontaine, and I remain skeptical if they even existed or were created at the last possible moment to avoid an embarrassment at the appeal proceedings. Unfortunately, I have no way to verify the date these documents were actually created and produced, only a fax header indicating when they were finally delivered to Solicitor Gregory LaFontaine. I did locate two eyewitnesses who are willing to testify before any court of law that they were in the Motions

and controlled drug. I had intended to pursue this issue further with subpoenas of medical records but both lack of time and funds precluded me from doing so at this time. Should Mr. Gorcyca DiMarco obtain more funds I will pursue this issue as I believe there is merit to his claim that his former counsel was partially impaired by medication at the extradition hearing as reflected by his failure to notify the court of pertinent and crucial facts, some of which are contained herein and well known to him at the time. The transcripts indicate and confirm that Mr. Gorcyca DiMarco tried repeatedly to bring this matter to the attention of the court directly and through said counsel but was ignored.

X) I have seen and reviewed two "pro-se" filings entitled "Notice To The Court" dated November 17th, 2003 and April 9th, 2004 that according to two witnesses willing to testify before the court, that both filings were rejected by the Clerk of Court for the Ontario Court of Appeals because they were not in the proper format. According to the content of these filings they were both seeking the court's guidance and instructions for dealing with the issues of "ineffective assistance of former counsel" (William Gilmour) and the missing charging documents.

Y) After searching every known professional resource available to me I was not able to locate any indication or record suggesting that Mr. Gorcyca DiMarco had any history whatsoever of stock fraud and was able to further determine that he did not own any shares of stock in any of the Companies named in the case records. In fact the only stock ever owned by Mr. Gorcyca DiMarco were shares issued over twenty-five years ago to his parents that he inherited upon their deaths. **I believe this information to be critical since I have never seen a stock fraud or manipulation case as those alleged to have been perpetrated by Mr. Gorcyca DiMarco where the fraudsters do not own shares in the promoted stock in order to profit from them. The grand total of moneys and assets seized by the U.S. Government from** Mr. Gorcyca's personal and corporate bank accounts amounted to less than $120,000 including $8,000 from his mother's saving's account. This money represented the total net worth of a 45 year old family man excluding the 40 year-old $100,000 home inherited from his parents. This amount of money is not indicative of a stock fraud on a scale suggested by the extradition case records by any stretch of the imagination.

Z) Under oath and confirmed to me by his wife, Mr. Gorcyca DiMarco declared that he absolutely had no intention of terminating his relationship with Solicitor Greg LaFontaine, but was compelled to discharge him by Justice Doherty who refused to accept any direct filings from Mr. Gorcyca DiMarco, unless and until Solicitor LaFontaine was released.

In summary of the above investigation, observations and my review of pertinent documents, transcripts, the court files, related submissions, and interviews with witnesses and consultation with Solicitor Marshal Drukarsh, I personally have

9

Atty. Wolkenstein attached as exhibit "A" hereto. I would advise anyone with a sincere interest in this matter to carefully review Mr. Gorcyca's final submission to the Minister dated December 5, 2005 and all exhibits therein as well as incidents involving former counsel Gilmour that include reported trips to Florida, Panama, his hand surgery, and prescribed medications while he was counsel of record, his personnel records with the RCMP and events leading to his termination, and any complaints registered with the Law Society over the years. There is reason to believe that former counsel Gilmour was himself arrested while serving as counsel of record in this matter that required him to surrender his firearms and seek psychological counseling. If true, it might perhaps explain the followimg;

Although I am not now in a position to provide irrefutable proof without another month of time and approximately $15,000 of anticipated expenses, I remain highly suspicious of the actions of Solicitor Gilmour and even more so of his many omissions and failure to disclose key facts of this case to the court. Available evidence suggests that almost all of the information contained herein was known, or made known to Solicitor Gilmour while he was counsel of record yet he made no effort to disclose same to the courts. Mr. Gorcyca DiMarco has suggested collusion or renumeration in this regard, and although I cannot agree without further investigatiom, I feel there are sufficient grounds to warrant a full investigation into this disturbing aspect of this case, especially in light of former counsel's attempt to sell confidential case files and a "deposition" to Canadian and U.S. lawyers linked to the American Financial Group fraud mentioned herein. This incident was also documented in the omitted filing to the Minister mentioned above. I noted that Solicitor Joseph Markin of Toronto made a motion for a continuance at the Appeal hearings specifically to address the issue of ineffective assistance of counsel of former counsel Gilmour, citing grounds that he was retained less than two weeks previous and had over eight thousand pages of documents, hours of audio recordings to review, and case law to research. The court record reflects that this motion was denied and Markin himself confirmed same in an interview.

I remain ready, willing, and able to pursue further investigation of any related issue or aspect of this extradition matter if adequate funding becomes available.

Hereby sworn and subscribed this 17 day of November, 2006 by


_____
Edward Reiken, President
Amera International, Inc.
2600 Skymark Avenue
Mississauga, Ontario
Canada

Sworn before me.
this 17th day of November 200

Massino Rolle

nassino d Rolle
A commissioner etc.

BORGES & ROLLE, LLP
Barristers & Solicitors
406-555 Burnhamthorpe Road
Toronto, Ontario M9C 2Y3
(416) 622-8718    11

**EXHIBIT E**

## AFFIDAVIT

STATE OF NEW YORK    }
                     }ss.:
COUNTY OF NEW YORK   }


David J. Wolkenstein, Esq., an attorney admitted to practice before the Courts of the State of New York, and before the United States District Court for the Eastern District of New York, being duly sworn, states under the penalty of perjury, as follows:

1.    I am an attorney admitted to practice law in the State of New York, with offices located at 22 West 38th Street, New York, New York 10018. My phone number is (212) 302-2600.

2.    On November 15, 2006, I traveled to the United States District Federal Court for the Eastern District of New York, located at 225 Cadman Plaza East, Brooklyn, New York, 11201.

3.    At the Court, in the office of the Clerk of the Court, I conducted a search of the records of filed cases, to ascertain and obtain case number(s) for any current or past criminal matters in which one  Bruce Anthony Gorcyca DiMarco was listed as a defendant.

4.    I searched for the following names in the records of the clerk:

   a.    Bruce Anthony Gorcyca DiMarco

   b.    Bruce Gorcyca

   c.    Anthony Gorcyca

   d.    Bruce DiMarco

   e.    Anthony DiMarco

5.    My search of the these names revealed that no person with any of these names has had any criminal complaint filed against them in the Eastern District of New York.

EXHIBIT F

EXHIBIT F

Ohio Department of Health
VITAL STATISTICS
**CERTIFICATE OF DEATH**
TYPE OR PRINT IN PERMANENT BLACK INK

Reg. Dist. No. ___
Primary Reg. Dist. No. ___
Registrar's No. ___

State File No. ___

1. Decedent's Name (First, Middle, LAST)
MARTHA   H.   CORCYCA

2. Sex — FEMALE

3. Date of Death (Month, Day, Year) — June 16, 1999

4. Social Security Number — 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

5a. Age—Last Birthday (Years) — 73

5b. Under One Year (Months / Days)

5c. Under One Day (Hours / Minutes)

6. Date of Birth (Month, Day, Year) — May 6, 1926

7. Birthplace (City and State or Foreign Country) — Merriel, MI

8. Was Decedent Ever in U.S. Armed Forces? — ☐ Yes ☒ No

8a. Place of Death (Check Only One) — Hospital ☐ Inpatient ☐ ER/Outpatient ☐ DOA ☒ Hospice ☐ Nursing Home ☐ Residence ☐ Other (Specify)

9. Facility Name (If Not Institution, Give Street and Number) — Parma Community Hospital

8b. City, Village, Twp., or Location of Death — Parma, Ohio

St. County of Death — Cuyahoga

10. Marital Status (Never Married, Married, Widowed, Divorced) — Widowed

11. Surviving Spouse (If Wife, Give Maiden Name)

12a. Decedent's Usual Occupation (Give kind of work done during most of working life. Do not use Retired) — Homemaker

12b. Kind of Business/Industry — Own Home

13a. Residence—State — Ohio

13b. County — Cuyahoga

13c. City, Town, Twp., or Location — Parma

13d. Street and Number — 5902 Gilbert Drive

13e. Inside City Limits? — ☒ Yes ☐ No

13f. ZIP Code — 44129

14. Was Decedent of Hispanic Origin? ☐ Yes ☒ No (If Yes, Specify Cuban, Mexican, Puerto Rican, etc.)

15. Race—American Indian, Black, White, etc. (Specify) — White

16. Decedent's Education (Elementary/Secondary (0-12) / College (1-4 or 5+)) — 12

17. Father's Name (First, Middle, Last) — Peter Mihal

18. Mother's Name (First, Middle, Maiden Surname) — Frances Stefko

Denise M. Kish, REGISTRAR & AUDITOR

CITY OF CUYAHOGA-CITY OF PARMA

I certify ... copy of th ... y this to be a true & correct certif ... rtificate on file in my office.

EXHIBIT 26
H

◁ **AMERA INTERNATIONAL INC.**

2600 Skymark Avenue, Suite 101– 6, Mississauga, Ontario, Canada  L4W 5B2
Tel: (905) 238 – 1010  •  Fax: (905) 238 – 1011  •  Toll Free: (800) 289 – 8531
Web Site: www.amera.net  •  E-mail: info@amera.net

Honourable Rob Nicholson
Minister of Justice
Honourable Michael Bryant                                        May 17 2007
Ontario Attorney General
Commissioner Beverly Busson

RE: Update concerning fraudulent extradition of Bruce A. Gorcyca DiMarco

Dear Friends,

In follow up to my previous investigative report dated November 17, 2006, I wish to advise you that I have since located and interviewed six eye witnesses including a doctor, who without a doubt nor reservation confirm that:

Bruce A. Gorcyca DiMarco was continuously in Parma Ohio during the entire period of mid April 1999 thru late December 1999 and four of the six witnesses were in daily contact with him in Parma. Mr. Gorcyca DiMarco was in Ohio during this time attending to his hospitalized mother (Martha Gorcyca) who then passed away in mid- June. Said witnesses also confirmed that Mr. Gorcyca DiMarco was a daily visitor to Parma community hospital while she was hospitalized.

This information directly contradicts and impeaches the extradition charging documents, which erroneously states or claims that Mr. Gorcyca DiMarco was in Florida sending faxes during the same time period from a former residence he had not resided in for almost 2 years.

These charging documents and extradition case record were authored by the same FBI agent (James Cronin), who also submitted false statements under oath about:

1, finding Mr. Gorcyca DiMarco's passport at the alledged crime scene.
2, that witness Perez would give incriminating testimony.
3, that exculpatory Elvin Feltner did not exist.
4, that witness James Tilton expected to provide incriminating testimony.
5, that witness Jacques Berhaak was expected to provide incriminating evidence.

In view of these five perjured statements, the lack of any known victim or deprivation, and newly-discovered alibi witnesses, I can only come to one logical conclusion…Mr. Cronin fabricated this case for ulterior motives, and deliberately deceived the Justice minister and our Canadian courts. I am available to assist further in this matter if required and willing to testify to all herein.

Respectfully,

Ed Reiken
Chief Investigator
CC: MP Paul Szabo
CC: Omar Alghabra
CC: Tracy tylor
CC: Files

*Affiliates in most major cities*

# LAFONTAINE & ASSOCIATES
### BARRISTERS

127 JOHN STREET
TORONTO, ONTARIO
M5V 2E2

TEL:   (416) 204-1835
FAX:  (416) 204-1849

<u>Delivered By Courier</u>

<u>Solicitor/Client Correspondence</u>
<u>Private & Confidential</u>

February 26, 2007

Bruce Gorcyca
c/o Linda Yum
610 Kedleston Way
Mississauga,  ON  L5H 1Y5

Dear Mr. Gorcyca:

This is my response to your request that I provide you with material that documents the process by which I was provided the charging document in your case. As I understand it, you want me to provide this material because you want to include it in your application for leave to appeal to the Supreme Court of Canada. I have attached a few different documents that I located in reviewing a portion of your file to help set out the timeline. As the bulk of your file has been sent to a storage facility and because, as you have advised in making the request for this material, time is of the essence, I am attempting to put together as accurate a summary as possible with the limited materials that are at my disposal.

1) The first document is a "cut and paste" of an e-mail that I received from my associate, Vincenzo Rondinelli on the evening of Sunday, April 2nd, 2006. I had requested the e-mail from Mr. Rondinelli in an e-mail I had sent to him earlier that evening – at 10:13 that evening to be precise. I had asked Mr. Rondinelli to send me an e-mail that would document for your file, his efforts to obtain the foreign charging document and the responses that he had received. Mr. Rondinelli's e-mail summarizes the two requests he made to Mr. Reitz for a copy of the foreign charging document and the responses that he received on each occasion.

2) The second document is the last in a series of e-mail communication between Mr. Reitz and me, which includes the content of the earlier communications in the series. The e-mail from Mr. Reitz on May 26th, 2006 attaching a "pdf" copy of the charging document is included. I cannot recall exactly when and how it was that I renewed the earlier request for a copy of the foreign charging document with Mr. Reitz. By May 26th, 2006, it seems that Mr. Reitz understood that the charging document had been sent by fax on March 31st, 2006. Of course, I was only making

---

GREGORY LAFONTAINE          VINCENZO RONDINELLI          CRYSTAL TOMUSIAK

-----Original Message-----
From: Enzo Rondinelli [mailto:rondinelli@sympatico.ca]
Sent: Sun 4/2/2006 10:31 PM
To: Greg Lafontaine
Subject: Re: gorcyca

gorcyca1) Spoke to Mr. Reitz on March 20 requesting the superseding criminal complaint dated September 20, 2000.  He indicated that he never received it (nor did he intend on receiving) and it was not something he generally expects to see in the material he receives.  He indicated that the material contained in the Appeal Book was the complete material with respect to Mr. Gorcyca.   

2) I had a further conversation with Mr. Reitz on March 30 just before our court appearance at the Ontario Court of Appeal.  I relayed your surprise that such an important document was not received since the Minister would have to rely on the superseding criminal complaint in order to reach a decision with respect to a surrender order.  Unlike his earlier attitude, this time Mr. Reitz indicated that Ottawa may very well have received such a document, but he has not seen it and in his opinion the case of Adam (I assume it's this case [2001] O.J. No. 4156?) doesn't require us to have it.

Does this suffice?

# UNITED STATES DISTRICT COURT

**EXHIBIT J**

EASTERN DISTRICT OF NEW YORK
PRO SE OFFICE

U.S. COURTHOUSE
225 CADMAN PLAZA EAST
BROOKLYN, NEW YORK 11201

June 1, 2007

Bruce Gorcyca, # 22169-004
Metropolitan Detention Center - Brooklyn
100  - 29th Street
Brooklyn, NY 11232

**Re: Recent Submission Made to the Court Without a Case/Docket Number**

Dear Mr. Gorcyca:

The Court cannot act upon your letter that was received on May 30, 2007 requesting a copy of case docket sheet.  It is being returned to you for the following reason: Our Office has been unable to match your name to any case filed in our Court. In addition, there is no U.S. District Court case/docket number affixed to it. What case is your set of papers to be applied to?  In order for our Office to accurately process your request we need to know what case you are making reference to. Thank you.

Sincerely,

Ralph Vega, Jr.,
Pro Se Writ Clerk

Enclosure

EXHIBIT K

IN THE MATTER OF:

## BRUCE ANTHONY GORCYCA DIMARCO

## STATUTORY DECLARATION OF MARSHALL E. DRUKARSH

I, Marshall E. Drukarsh, Barrister & Solicitor, in the City of Toronto, Province of Ontario
MAKE OATH AND SAY:

1. During the period July 2000 through 2001 I represented Bruce Anthony Gorcyca
   DiMarco with respect to immigration and extradition matters; and as such have
   knowledge of the matters hereinafter deposed.

2. Mr. DiMarco has requested this statutory declaration from me to address certain
   issues and I am preparing it from my recollection of events aided by a cursory
   examination of voluminous files. The matters hereinafter deposed are accurate to
   the best of my recollection and belief.

3. When I was initially retained to represent Mr. DiMarco he was detained at the
   Toronto West Detention Centre, having been arrested by a task force purportedly
   for violation of Immigration Law.

4. The initial report written against him on June 27, 2002 alleged breaches of
   paragraphs 27(2)(g), 27(2)(e), 27(1)(c), 27(2)(b) and 26(1)(b) of the Immigration
   Act, purporting to rely on information, the overwhelming bulk of which was
   subsequently proven to be inaccurate.

5. Mr. DiMarco sought my advice and instruction in the protection available to him
   in light of his subjective belief that he faced potential persecution in United States

11. This will confirm that I was successful in representing Mr. DiMarco in obtaining a conditional departure order as the adjudicated decision of the accusations of inadmissibility against him.

12. This will confirm that I represented Mr. DiMarco and was successful in assisting him to be recognized for judicial interim release from his arrest for extradition.

13. This will confirm that upon his release from detention for extradition he was remitted into the custody of Immigration authorities.

14. This will confirm that after several unsuccessful attempts to represent Mr. DiMarco at monthly detention reviews on his immigration detention, including as I recall my having received and surrendered Mr. DiMarco's passport to Immigration Enforcement officials, eventually I surrendered the brief as his counsel.

15. This will confirm that during the course of my representation of Mr. DiMarco, various matters came to light which confirmed the accuracy and credibility of many of the propositions which he put forward from time to time. For example, Mr. DiMarco had expressed fears of safety for he and his family. He asked me to put him in touch with senior police officials to whom he could express his concerns. I did so and was advised that the officer did have serious concerns for the safety of Mr. DiMarco and his family, however, intervention from his force would involve too much political baggage.

16. This will confirm that one of the key issues in the allegations initially made by Immigration against Mr. Dimarco, concerned his entry to Canada and that in the course of my representing him he informed me that he had retained William Gilmore to assist him in other matters. I think at that time Mr. Gilmore either had or was about to take over carriage of the extradition maters.

attempted to reach Mr. Gilmore by telephone, but he was out of town. When I finally spoke to him I asked what it was that he felt I could assist the court with in terms of my evidence and material. We discussed the basis of the arrest for extradition and my conclusion as to why Mr. DiMarco was arrested for extradition at the moment that he was arrested for extradition, including remarks made by the arresting officer during the detention review, the timing of the extradition warrant and other matters.

23. I was not called to testify at Mr. DiMarco's extradition hearing.

24. I did provide Mr. Gilmore with an affidavit dated December 28, 2001.

25. It is my opinion, based on the totality of my contact with Mr. DiMarco, wherein I have received information from him which from time to time has been corroborated by my personal contact with others, including Canadian and American officials, that the extradition proceedings to which Mr. DiMarco is subject, were initiated essentially for the purpose of compelling him to return to the United States because certain authorities there viewed him as an unwilling, but essential witness, someone who believed that others called upon to testify had been killed and who therefore chose to make himself unavailable to testify, with respect to certain matters they were investigating and that the initiation of the extradition proceedings was triggered by Mr. DiMarco having sought refuge and protection in Canada.

26. It is my respectful opinion, from the totality of my knowledge of these matters, that it is not unreasonable for Mr. DiMarco to have expressed what I accept from him as being a sincere fear of persecution and physical jeopardy to himself and his family, if and when he is returned to the United States.

Case 1:07-cv-03066-JBW   Document 1   Filed 07/17/07   Page 43 of 57   PageID #: 1802
EXHIBIT L

CELEBRATING OUR 40th ANNIVERSARY

# THE Mississauga News

## Weekend Edition

3145 Wolfedale Rd., Mississauga, Ontario L5C 3A9
April 30-May 1, 2005, Vol. 40, No. 134, 40 pages

$1 (plus 7¢ GST)

Community Living

4 The Mississauga News — April 30 - May 1, 2005

# Three living Canadian donors offer help

• Continued from page 1

Coast Guard, who married a Mississauga and moved to Canada six years ago, is so committed to the cause, he founded Veteran Organ Donors International (VODI) last November to reunite additional donors.

Thanks to interviews on BBC radio, the group has already received organ pledges from 12 donors in Canada, the U.S. the U.K. Three are living donors like Goroye, the others are post-mortem donors.

Goroye readily concedes that the Iraqi children were not deliberately targeted by military forces, but says "the pain, agony, and misery inflicted upon those children mato no distinction as to screening with burns covering 60 per cent of their bodies.

### Three Iraqi children to receive organs

"Imagine coming home from work one day only to find your home in a smoldering ruin of rubble and your 5-year-old son, daughter, or grandchild missing, a limb or

There is no greater story for any parent," said Goroye, who is himself a parent.

Goroye dismisses suggestions that VODI is being "Un-American" for not donating their organs to U.S. soldiers injured in the conflicts.

"Soldiers still have their families alive to donate organs and take care of them, but these kids, in most cases, have no one," he said.

VODI received its funding from any government and is funding their efforts from their own pockets.

They did, however ask a major airline to donate round-trip tickets for the children who will have to fly to Toronto for the transplants since they have neither the facilities nor surgical expertise in Iraq. Two local hotels have already offered to donate 90 days of

free accommodations for children and a guardian. VODI is actively approaching corporations to raise some $30,000 to pay for the surgeries.

Goroye says there's no minimal risk to one's personal health in being an organ donor.

"Organ transplants have become somewhat routine, with over 1,800 organs being donated in Canada alone in 2004," he said.

According to VODI, leukemia rates in Iraq have almost doubled in the past decade due to the extensive use of depleted uranium artillery, anti-tank shells, and bombs used in the two wars. Only bone marrow transplants can give a child leukemia patient a chance to recover.

For more information about VODI, visit its website www.vodi.org.

# Man offers life gifts

By JOSEPH CHIN
Staff

Moved by the suffering of Iraqi children maimed by two wars in the last 15 years, a Port Credit resident is donating one of his kidneys, a section of his liver, and bone marrow to three of the victims.

Bruce Goroye is scheduled to go under the surgeon's knife in two operations set for June in hospitals in Toronto and Ottawa. The organ recipients, Fira Taha Mohammed and Ghasai Kamal, both 14, and Kathoon Abdullah, 17, were selected from more than 2,000 children based on their critical situation.

The kids of Iraq lost much more than just a war," said 66-year-old Goroye. "Many of them lost their parents, their homes, their belongings, and even their limbs. We don't want them to lose their future as well."

Goroye, a veteran of the U.S.

• See Three on page 4





EXHIBIT
M

October 22, 2002

To whom it might interest;

My name is Luis Aponte and I am a U.S. citizen and practicing physician residing in Aguadilla, Puerto Rico for over the past twenty years on the old Ramey Air Force Base.

I have known Bruce A. Gorcyca since 1977 when he also resided here at Ramey. We were friends, neighbors, and both board members of The Ramey Community Council, a civic organization that was founded by Bruce when he was about 22 years old. Bruce was the first elected chairman of The Ramey Community Council and I was the second. This organization was active for about four or five years and was well known in local political circles for our community activism.

Amongst the causes/projects we undertook on behalf of the 6,000+ Ramey residents were;

*Purchase of our homes from the U.S. government
*Community Health & Safety issues
*Exposing and Protesting the DOW Chemical toxic chemical site
*Exposing the commercial exploitation of public beaches
*Exposing and protesting political corruption
*Re-Opening the old Ramey AFB hospital as a rehab center for the handicapped.

We were successful in all but the last one of our endeavors due to political interference in an election year.

Bruce was well known and respected in the community and he appeared in the local newspapers on a regular basis including a few times with myself. He wrote over a dozen editorials that appeared in El Mundo, The San Juan Star, and El Reportero newspapers. The community gave him an award for his volunteer work with The Ramey Community Council. He was known as a whistle-blower and fighter for the community. Despite a few personal threats, he was never intimidated and persisted. Bruce was also a good motivator and public speaker. Corrupt politicians hated and feared Bruce.

He and Attorney Roberto Raffols exposed the secret Dow Chemical site and organized a massive protest of over a thousand people who marched from Aguadilla to San Juan. The event received much press coverage and forced Dow Chemical to close down their toxic waste site. This was a major victory for our community's environment.

In retrospect, I can say that Bruce left his mark on our community and most people here are grateful for the countless hours of his time and energy he donated to community causes.

Signed -

Dr. Luis Aponte, M.D.
105 M Street
Punta Borinquen, P.R. 00604
(787) 890-5200

EXHIBIT N

# Television News Archive
### VANDERBILT UNIVERSITY

## ABC Evening News for Thursday, Apr 03, 1997

## Headline: FBI / Russian Mob / Globus

Request this Video

**Abstract:** (Studio: Peter Jennings) Last night's story on the FBI operation that sought indictments of Russians working for a company named Globus recalled. Clarification given that the Globus group involved in New York is different from a Globus group in Miami.

**Begin Time:** 05:46:00 pm

**End Time:** 05:46:30 pm

**TVN Record Number:** 172829

**Copyright:** Abstract and Metadata (c) 1997-2006 Vanderbilt University

This information describes a segment of a news broadcast held by the Vanderbilt Television News Archive. The Archive has recorded news programs from the U.S. national television networks since August 1968. To view this item, you may request that a copy be sent to you through the Archive's videotape loan service. We charge a service fee to help recover the costs.

Enter TV-News Search

Sample Search [                    ] Search

TV-NewsSearch locates material in the collection of the Vanderbilt Television News Archive. This resource describes over news items, including our comprehensive collection of evening news programs of ABC, CBS, and NBC aired since 1968. News programs from CNN are available from 1995 and Fox News beginning in 2004. The collection also includes live coverage of major events as covered by the national news networks. The TV-NewsSearch interface allows you to select items of interest and request copies of clips or programs to be loaned to you on videotape.

# SIGHTINGS

# Slain Net Stock Traders Were Government Informants

From NewsHawk Inc. <newshawk1@luckynumber.com>
http://www.abcnews.go.com/wire/US/ap19991029_720.html
10-29-99

**COLTS NECK, NJ** – Two Internet stock promoters found shot to death in a New Jersey mansion had served as government informants, providing information on securities fraud cases, according to published reports today.

Alain Chalem and Maier Lehmann were crippled by gunfire and then shot point-blank in their heads, investigators said. Their bodies were found early Tuesday in the opulent estate Chalem shared with his girlfriend.

Regulatory and law enforcement sources said they were uncertain whether the information the men provided in the securities investigations was damaging enough to provoke the shootings, The New York Times reported today.

Lehmann had cooperated with authorities following a plea agreement stemming from a 1992 insurance fraud case, The Star-Ledger of Newark reported today. <snip Chalem, 41, and Lehmann, 37, were not registered brokers. They promoted certain stocks on their Web site, which is registered in Panama and operated by an administrator in Hungary, regulators said.

Detectives from the prosecutor's office, as well as FBI agents and SEC investigators, are trying to unravel the complex web of stock deals the two were involved in, said prosecutor Robert Honecker.

EXHIBIT P

# Certificate of Marriage

## THIS IS TO CERTIFY

That on the _____ Thirty-First _____ day of _____ October _____

in the year of our Lord 19 _98_

Bruce Anthony Garcyca DiMarco

and

Linda Yum

### WERE BY ME UNITED IN

## MARRIAGE

At _Parma Municipal Court_

according to the laws of _____ Ohio _____

By _Judge Mary L Dunning_

Judge Mary L Dunning

The Parma Municipal Court

WITNESSES

Edmund V. Malone

_[signature]_

*EXHIBIT G*



**EDITORIAL**

*May 27/03*

Mr. Bruce Gorcyca:

I am an award-winning investigative reporter with the Ottawa Citizen. I am contacting you because I have received information about your extradition case from high level Canadian intelligence sources, verifying your accounts of events relating to American Financial Group, Edward Chism, Norriega funds, and David Seigel.

I understand the next court date in the appeal process is scheduled for June. I would like to meet you in Toronto next week to discuss these matters in detail. The material I have been given about your case is quite extensive, and disturbing - to the point where some Canadian officials are concerned for your safety if you are extradited to the U.S.

Please contact me at 613 292-4280, or by email at: pmckay@thecitizen.canwest.com.

I will meet you in Toronto at a time and place convenient to you. Paul McKay/Ottawa Citizen.

*Paul McK*

*Ottawa Citizen newsroom:*
*613.596.3664*

1101 BAXTER ROAD, P.O. BOX 5020, OTTAWA, ONTARIO K2C 3M4, CANADA
PHONE: (613) 596-3664 • FAX: (613) 726-1198

RE. EXHIBIT
R



070202 00:16  M4L 3T0 R49

NE 0703300479

CANADA · POSTES
POST · CANADA

00.52

M5S 2C5    2007-02-01

Bruce Anthony Gorcyca DiMarco
610 Kedleston Way
Mississauga, Ontario
L5H 1Y5



UNIVERSITY OF
TORONTO
FACULTY OF LAW

78 Queen's Park, Toronto, ON, Canada M5S 2C5 —



# Faculty of Law UNIVERSITY OF TORONTO

78 Queen's Park Toronto Canada M5S 2C5

January 30, 2007

Confidential

Mr. Bruce A. Gorcyca-DiMarco
610 Kedleston Way
Mississauga, ON  L5H-1Y5

Dear Bruce,

Having just invested my entire weekend to review your case files, transcripts, and your complaint to the Law Society, I must admit that I have never seen such an abuse of process in my entire law career. Please forgive my original skepticism, but I'm sure you understand how unbelievable your story must appear to somehow who did not review these files, Mr. Reiken's report, or your manuscripts, which are quite compelling.

Whether Solicitor Gilmore was compromised, impaired, or just plain negligent, he clearly failed you miserably in his duties and obligations to you as a client. His failure to mention the absence of an indictment and pound on the missing charging documents is inexplicable. Most appalling to me however, is how he left you alone with those agents to avoid becoming a witness and his attempt to sell your files and collect moneys from the very people threatening to kill your family. Surely, this man should not be practicing law. It's somewhat obvious that his primary focus was money and not your welfare.

But it appears that your problems with Solicitor Gilmour pale in comparison those of your case. Considering that you do not want to publish your book, and you have no funds remaining for another lawyer, I only see two alternatives. You can either get another lawyer from Legal Services or you can take your plight to the news media, which would probably be more effective considering the huge political implications of this matter. You might also want to have a good sit down with your MP with all the new material uncovered by Mr. Reiken since his report gives substantial credibility to your story.

Personally I regret that I cannot further involve myself since the legal profession in Ontario is a small world, and for me to speak out on your behalf would certainly jeopardize my career and tenure here. However, you have my moral support and I will quietly try to assist you wherever possible. Please do not quote me by name if you do decide to go public. With your permission, I want to share your matter with some trusted associates who have a few political contacts that may benefit your cause.

Bruce, I appreciate your anger and frustration for sure. But frankly Justice Dunnet is not entirely to blame and I would give her the benefit of the doubt since she did not get to

U.S. Department of Justice

EXHIBIT S

NOV 3 0 2004

Executive Office for United States Attorneys
*Freedom of Information/Privacy Act Unit*
*600 E Street, N.W., Room 7300*
*Washington, D.C. 20530*
*202-616-6757  Fax 202-616-6478*

Request Number: __02-3513_____ Date of Receipt: _October 24, 2002_

Requester: _____Bruce A. DiMarco_

Subject: _Self_

Dear Requester:

    In response to your Freedom of Information Act and/or Privacy Act request, the paragraph(s) checked below apply:

1. [ ]  A search for records located in the EOUSA's Personnel Office has revealed No Records.

2. [XX]  A search for records located in the United States Attorney's Office(s) for the **Eastern District of New York** has revealed **No Records**. **(Please see the attached explanation sheet)**.

3. [ ]  The records which you have requested from the_____ _____ cannot be located.

4. [ ]  This office is continuing its work on the other subject/districts mentioned in your request.

5. [XX]  This is the final action my office will take on this particular request.

    You may appeal my decision in this matter by writing within sixty (60) days from the date of this letter, to:

Office of Information and Privacy
United States Department of Justice
Flag Building, Suite 570
Washington, D.C. 20530

    Both the envelope and the letter of appeal must be clearly marked "Freedom of Information Act/Privacy Act Appeal."

    After the appeal has been decided, you may have judicial review by filing a complaint in the United States District Court for the judicial district in which you reside or have your principal place of business; the judicial district in which the requested records, if any, are located; or in the District of Columbia.

Sincerely,

*Marie A. O'Rourke / NB4*

Marie A. O'Rourke
Assistant Director

EXHIBIT U

102
Submissions (Gilmour)


before you.

5                    THE COURT:    Where?

                     MR. GILMOUR:    In the correspondence in
volume 1.  Pardon me, if I can just have a moment.

                     THE COURT:    Tab K?

10                   MR. GILMOUR:    Yes,   Tab K, Your Honour,
where she talks about the request that I made to her for the
specifics and for the amount of the fraud in order to apply
the sentencing guidelines for indeed the-- for the purpose of
my visit to Brooklyn was to negotiate a plea bargain with

15  her, and in fact that was swiftly rebuffed.  However, she was
asked for those particulars, and I make the point that none
of that has ever been provided, and I suggest to Your Honour
that it is fair to infer that they simply haven't done the

20  investigation, they haven't taken the statements from these
people, and what they have done here is that the Requesting
State simply put forward what they think they would like
their case to look like when it comes to trial.    Let's get

25  Mr. Gorcyca back here and after that, then we'll go about
trying to find the evidence to support what we said we
expected to say, but if we don't find it, it doesn't matter
because he's back here any ways.  And that's particularly
poignant, Your Honour, where the investigating officer is not

30  able to say "I will testify".   He says "I expect to be able
to testify".

# Who is Bruce A. Gorcyca DiMarco?

*Born & Raised in Parma, Ohio – son of Martha & Raymond Gorcyca
*Graduated 1968 from St. Charles Borremeo Elementary School
*Graduated with Honors from Padua Franciscan High School in 1972
*Enlisted in U.S. Coast Guard 1974 – Honourably Discharged 1977
*Graduated Inter American University in 1980 with BBA, BAPA, BAPS

## Employment:

- Certified PADI Scuba Instructor  #10128 OWSI  (1977-Present)
- Rescue Boat Coxswain in U.S. Coast Guard 1974-1977
- Special Advisor To Governor Romero Barcelo of Puerto Rico
- Youth In Action Supervisor 1979
- Owner/Operator Borinquen Aquaventures (Dive Shop)
- U.S. Justice Department (INS)  1981
- FAA  Air Traffic Controller (1982)
- United States Treasury Dept. (IRS)  1983-84
- Marketing Manager Latin America for United Technologies (1985)
- Sales Manager, Bally Scandinavian Health Spas
- Franchise Owner National Health Guard Autologous Blood Bank
- U.S. Delegate to China Trade Commission (1997-1998)
- Executive Vice President American Financial Group (1990-1996)
- President of The Globus Group (1995-1999)

## Volunteer Service

- Red Cross First Aid, CPR, Water Safety & Liefsaving Instructor, Disaster Relief Counsellor,  Blood Bank Volunteer  (1975 – 1990)
- House Parent for children of single abused mothers for Salavation Army In Miami 1990.
- Certified HRS AIDS Counsellor  (1992-1999)
- Elected Chairman of Ramey Community Council (1978-1980)
- Founder & First Chairman of American AIDS Alert Association (1995)
- Governor's Dengue Fever Task Force (1979)
- Chairman of Lorne Park Resident's Association (2001-2002)

To Whom It May Concern;

June 14, 2007

We know that Bruce Anthony Gorcyca DiMarco was in Parma Ohio with his pregnant wife (Linda Yum) and mother in law (Chai Jin Yum ) from April 1999 until December 1999.

Linda's sister Judy had made numerous calls to their Parma residence throughout the duration of this time.

When we eventually left for Canada, we put the following card on the door if anyone needed to reach us.

_Ji Hae Linda Yum DiMarco_

_Chai Jin Yum_

_Johng Hea Judy Yum_



**Pacific Blue Productions**
www.PacificBlueProductions.com
3575 Kaneff Crescent, Suite 2205, Toronto-Canada, L5A 3Y5

**Anthony DiMarco**
Executive Director

Phone: (905) 949-4487
Fax: (905) 949-4487



EXHIBIT
X

████████████████, D.D.S.

July 6:00

TO WHOM IT MAY CONCERN,

I HAVE KNOWN BRUCE GORCYCA AND HIS LATE MOTHER FOR
OVER 30 YEARS. BRUCE HAS BEEN TO MY OFFICE(OHIO)
ON 8-13-98 AND 12-3-99 AS A PATIENT.

I MET SEVERAL TIMES WITH BRUCE AND HIS WIFE, LINDA
HERE IN OHIO FROM ABOUT 4/99 THROUGH 12/99 WHEN
THEY CAME TO TAKE CARE OF HIS VERY ILL MOTHER (WHO
DIED JUNE 99)AND TO GET HER AFFAIRS IN ORDER. I
ATTENDED MRS. GORCYCA'S FUNERAL ALONG WITH BRUCE
AND HIS WIFE LINDA.

SOMETIME AT THE END OF 99 AND BEFORE MRS. GORCYCA'S
DEATH, BRUCE SEEMED CONCERNED/THREATENED BY A RUSSIAN
MOBSTER AND SHOWED ME A NEWSPAPER ARTICLE ABOUT THIS
MOBSTER.

I LAST SAW BRUCE AT MY FAMILY'S CHRISTMAS PARTY 12/99.



EXHIBIT
Y

June 30, 2000


To Whom It May Concern:

I did see Bruce Gorcyca at Parma Hospital in May, 1999 while his mother was a patient
in the hospital.  He said he was living in Florida at that time but was in Parma, Ohio
taking care of his mother.  I had not seen Bruce for at least 10 years prior to 1999.



EXHIBIT Z

July 06 2000

To whom it may concern

I have known Bruce Gorcyca since his birth. I am ▓▓▓▓▓▓▓▓▓. and we have been neighbors in Parma , Ohio for all of my life. I work for Tops Friendly Markets  I have been at this job since 1967.

I can confirm that both Bruce and myself visited his mother at Parma Community Hospital from April through June of 1999 and we were both at her bedside when she died June 14 1999. I can also verify that Bruce Gorcyca remaind here in Ohio during that entire period as well as through mid December, when he left for Canada.

Sometime in September of '99 I recall that Bruce told me that someone was threating to kill him and his pregnant wife if  he cooperated with U.S. authorities. He was clearly upset and exteremely worried Later in November he gave me a n article from BARRONS involving Russian gangsters  and said he was taking his wife and son to Linda's parents home in Toronto, Canada where he hoped the Russians wouldn't find him. The last time I saw Bruce was about six weeks ago when he came to make repairs at his mom's house with Linda and her father.

7 6 00